## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**GIBBS KANYONGO JR.,**

Plaintiff,

v.

**THE BANK OF NEW YORK MELLON CORPORATION**

Defendant.

**CIV. ACTION NO.**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Gibbs Kanyongo Jr. ("Plaintiff" or "Mr. Kanyongo"), by and through his undersigned counsel, brings this civil action against Defendant The Bank of New York Mellon Corporation ("BNY" or "Defendant"), and alleges as follows:

### NATURE OF THE ACTION

1. This is an action for disability discrimination, failure to accommodate, and retaliation under the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. § 12101 et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 et seq. Plaintiff brings claims under the PHRA for notice purposes only. Plaintiff will seek leave to amend following the 1-year statutory deadline for exhaustion of PHRA claims.

2. Mr. Kanyongo, a young African American man employed by BNY as a Client Processing Associate, suffered a serious foot injury in August 2025 that required him to work remotely. He immediately notified BNY, repeatedly sought guidance on how to complete the reasonable accommodation process, obtained a properly completed medical certification from his

treating provider, and transmitted the completed paperwork to BNY's designated email address weeks before his termination. BNY failed to process that paperwork, allowed an automated attendance system to flag Mr. Kanyongo for policy violations that his pending accommodation should have excused, and terminated him on October 17, 2025 - twenty-three days after he emailed BNY's own people advisors inbox the completed documentation BNY had requested.

3. Throughout this process, BNY's own internal records - including entries in BNY's People Solutions portal - confirm that Mr. Kanyongo's manager actively discouraged him from entering in-office exceptions, directly undermining the mechanism BNY's own HR department had told him to use to protect himself from policy violations. BNY's failure to engage in a good-faith interactive process, its failure to accommodate Mr. Kanyongo's disability, and its discriminatory termination of Mr. Kanyongo while his accommodation request was pending violated the ADA and the PHRA.

4. Mr. Kanyongo seeks compensatory damages, back pay, front pay, emotional distress damages, punitive damages, attorneys' fees, costs, and all other relief to which he is entitled.

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, and pursuant to 42 U.S.C. § 12117(a) of the ADA.

6. This Court has supplemental jurisdiction over Plaintiff's state law claims under the PHRA pursuant to 28 U.S.C. § 1367.

7. Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and Plaintiff was employed by Defendant at a location within this District.

8.    Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 533-2026-0493. The EEOC issued a Notice of Right to Sue on or about April 15, 2026. This Complaint is filed within ninety (90) days of Plaintiff's receipt of that Notice. Plaintiff has exhausted all administrative prerequisites to suit.

**PARTIES**

9.  Plaintiff Gibbs Kanyongo Jr. is an adult individual who resides at 500 Demmler Drive, Pittsburgh, Pennsylvania 15237. Mr. Kanyongo is an African American male born on September 24, 1999. At all times relevant hereto, Mr. Kanyongo was an employee of BNY within the meaning of the ADA and the PHRA.

10.    Defendant The Bank of New York Mellon Corporation ("BNY") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 240 Greenwich Street, New York, New York 10286. BNY employs more than five thousand (5,000) employees and is an employer within the meaning of the ADA and the PHRA. BNY does business in the Commonwealth of Pennsylvania and employed Mr. Kanyongo at its offices in Pittsburgh, Pennsylvania.

**STATEMENT OF FACTS**

11.  BNY hired Mr. Kanyongo on February 10, 2025, as a Client Processing Associate in its Loan Administration department in Pittsburgh, Pennsylvania, at an annual salary of approximately $60,000.

12.   Mr. Kanyongo performed the duties of his position satisfactorily throughout his employment. His duties included facility maintenance functions on commercial loans.

13.  Under BNY's "Working Together" policy, employees including Mr. Kanyongo were required to work a minimum of three days per week in the office, measured over monthly

periods. Employees who failed to meet the in-office minimum could receive a "Confirmation of Standards" written notice of violation; employees who received two such violations within a twelve-month period were subject to termination.

14.  In May 2025, Mr. Kanyongo received a first Confirmation of Standards notice for the period from March 23, 2025 to April 19, 2025. He acknowledged this notice. This first violation predated any disability and is not the subject of this action, except insofar as BNY used it in combination with the second, disability-related violation to justify termination.

15.  On the evening of August 4, 2025, Mr. Kanyongo suffered a serious injury to his foot and ankle while playing basketball.

16.  On August 5, 2025, Mr. Kanyongo sought treatment at an urgent care facility. X-rays confirmed a broken bone in his foot with ligament damage in his ankle. Medical documentation from that visit stated that Mr. Kanyongo had limited mobility and needed to work from home.

17.  On August 6, 2025, Mr. Kanyongo was evaluated by a podiatrist at UPMC who diagnosed him with a severe ankle sprain and provided signed medical documentation stating that Mr. Kanyongo was limited in his ability to walk and needed to work from home for six to eight weeks.

18.  Mr. Kanyongo's broken foot and ankle injury, and the resulting limitations on his ability to walk and travel, constitute a physical impairment that substantially limits one or more major life activities within the meaning of the ADA and the PHRA.

19.  On August 7, 2025, Mr. Kanyongo immediately called BNY's HR department, reported his injury, and asked how to submit his medical documentation to be excused from the in-office requirement. HR directed him to submit a formal reasonable accommodation request

through BNY's online portal and to have his doctor complete BNY's Medical Certification: Reasonable Accommodation form.

20.  At the time of Mr. Kanyongo's injury, the relevant in-office requirement period was nearing its end on August 8, 2025. Mr. Kanyongo had already satisfied the in-office requirement for the bulk of that period but was unable to come into the office during the final days due to his injury.

21.  When Mr. Kanyongo asked his manager, Sally Baker, what he should enter into BNY's time system for the days he could not come into the office due to his injury, Ms. Baker told him she did not know and directed him to contact HR.

22.  On August 12, 2025, Mr. Kanyongo called HR and asked what he should enter in the time system for the period of August 4 onward. HR advised him to enter "in-office exceptions" for days he was working from home. Mr. Kanyongo informed HR that his manager had indicated that in-office exceptions would not apply to his situation.

23.  On August 15, 2025, Mr. Kanyongo received notice that he had been flagged for failing to meet the in-office requirement for the period ending August 8, 2025. He called HR to report this and ask what he should enter for those days. An HR representative told Mr. Kanyongo not to worry - that when his completed reasonable accommodation forms were received and approved, the accommodation would retroactively cover and excuse those flagged days.

24.  BNY's own People Solutions portal records, dated September 19, 2025, document that Mr. Kanyongo contacted HR and reported that his manager had advised him "he cannot keep using in-office exceptions & he can only use three in-office exceptions for the time being," and that "his manager is not approving of in-office exceptions." These entries are BNY's own contemporaneous internal records, recorded by BNY's own HR team in real time.

25.   BNY's position statement to the EEOC asserted that Ms. Baker "never told [Mr. Kanyongo] he was not allowed to enter in-office exceptions" and in fact "encouraged him to do so." BNY's own portal records directly contradict this assertion.

26.   Mr. Kanyongo diligently pursued the accommodation process throughout the relevant period. He called BNY's HR department multiple times each week seeking guidance. His AT&T telephone records confirm calls to BNY's People Team line (800-947-4748) on multiple occasions, including an eighteen-minute call on September 19, 2025 and a thirty-seven-minute call on October 14, 2025 - three days before his termination.

27.   On August 26, 2025, Mr. Kanyongo obtained his doctor's completed medical certification and submitted it to BNY via the People Solutions portal. BNY waited until September 5, 2025 to respond, at which point it informed Mr. Kanyongo that his physician had incorrectly completed certain portions of the form and that corrected documentation was required.

28.   On September 5, 2025, Mr. Kanyongo submitted a detailed message in BNY's own portal documenting his frustration and the extraordinary efforts he had made to comply. He wrote, in relevant part, that he was "unable to walk or travel," had "been trying to get this request submitted and approved for over a month," had "called every week talking to someone asking for an update," and had arranged to be picked up and transported to his doctor's office on his broken foot to have forms completed. He pleaded with BNY's People Advisor Team to simply call the telephone number his physician had left on the form. BNY refused, citing HIPAA regulations.

29.   On or around September 5, 2025, Mr. Kanyongo also informed HR that he would be going on a mandatory two-week security leave from approximately September 22 through October 3, 2025, during which he would be unable to access BNY's internal systems. He asked

whether he could obtain corrected paperwork during that period and transmit it via email. HR confirmed that would be acceptable and provided him an email address - peopleadvisorsamericas@bny.com - to which he should send the completed forms.

30.    On September 19, 2025, Mr. Kanyongo called HR to confirm this arrangement. BNY's own portal records for that date confirm that BNY's People Advisor Team was aware Mr. Kanyongo "will be on his mandatory absence from 09/22-10/03" and directed that the team "reach out to him through his personal email."

31.    On September 22, 2025, Mr. Kanyongo obtained a corrected medical certification, executed by his treating provider Olivia Deltonibu PA-C at Orthopedic Specialists, 9104 Babcock Boulevard, Suite 5113, Pittsburgh, Pennsylvania 15237. The corrected certification had Question 7 checked "Yes" - confirming that Mr. Kanyongo could perform the essential functions of his position with a reasonable accommodation - and Question 8 checked "Yes" - confirming that the accommodation being requested was remote work - with a recommended start date of August 4, 2025 and an end date of November 4, 2025. Mr. Kanyongo also completed and signed the employee portion of the accommodation form on September 22, 2025.

32.    On September 24, 2025, at 1:54 PM, Mr. Kanyongo sent the fully and correctly completed medical certification to peopleadvisorsamericas@bny.com from his personal email account, with the subject line "Accommodation request." The email identified Mr. Kanyongo by name and attached the signed certification.

33.    BNY received Mr. Kanyongo's September 24, 2025 email with the completed accommodation paperwork. At no time in the twenty-three days between September 24, 2025 and Mr. Kanyongo's October 17, 2025 termination did BNY contact Mr. Kanyongo to advise

him that it had not received his documentation, that his request had not been processed, or that he remained at risk of termination.

34. Mr. Kanyongo returned from his mandatory leave on approximately October 6, 2025, and continued working from home in accordance with his medical documentation.

35. On the morning of October 17, 2025, Mr. Kanyongo discovered an automated email notification indicating he had failed to meet BNY's Working Together in-office requirements for a second measurement period, covering September 6 through October 4, 2025. The automated system had also not credited his accommodation for the first flagged period ending August 8, 2025 - the very period that BNY's own HR representative had told him his completed accommodation would retroactively excuse.

36. Mr. Kanyongo immediately called HR upon discovering the automated notification. An HR representative told him she could not confirm whether his emailed documentation had been received or processed and that she would need to reach out to the team that handled the email inbox.

37. On October 17, 2025, at approximately 10:30 AM, Mr. Kanyongo's manager called him and informed him he was being terminated for failing to meet the Working Together in-office requirement on two occasions. BNY's effective termination date was October 24, 2025.

38. At the time of his termination, Mr. Kanyongo had a fully and correctly completed reasonable accommodation request - with medical certification signed by his treating provider - sitting in BNY's own designated email inbox, unprocessed.

39. As a direct and proximate result of BNY's unlawful conduct, Mr. Kanyongo suffered and continues to suffer substantial damages, including lost wages and benefits, loss of future earning capacity, and severe emotional distress.

40.    Mr. Kanyongo was unemployed for approximately six months following his termination before securing new employment. His new position pays approximately $5.00 less per hour than his BNY salary, representing an ongoing wage differential of approximately $10,000 per year.

## COUNT I
### Failure to Accommodate in Violation of the ADA
*42 U.S.C. § 12112(b)(5)(A)*

41.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

42.    At all times relevant hereto, Mr. Kanyongo was a qualified individual with a disability within the meaning of the ADA. His broken foot and ankle injury, with resulting limitations on his ability to walk and travel, constituted a physical impairment that substantially limited one or more of his major life activities.

43.    Mr. Kanyongo was qualified to perform the essential functions of his Client Processing Associate position, with or without reasonable accommodation, as confirmed by his treating healthcare provider's medical certification.

44.    BNY had knowledge of Mr. Kanyongo's disability beginning no later than August 7, 2025, when Mr. Kanyongo called HR and reported his injury and resulting limitations.

45.    Mr. Kanyongo requested a reasonable accommodation - specifically, the ability to work remotely for the duration of his recovery - beginning August 7, 2025, and continuing throughout the relevant period.

46.    Remote work was a reasonable accommodation that would have enabled Mr. Kanyongo to perform the essential functions of his position without undue hardship to BNY, as

BNY's own accommodation request form acknowledges remote work as a recognized accommodation category.

47. BNY failed to engage in a good-faith interactive process with Mr. Kanyongo. Despite Mr. Kanyongo's repeated, documented, and diligent efforts over the course of more than two months to complete the accommodation process, BNY: (a) failed to timely process his initial submission; (b) through Mr. Kanyongo's manager, actively discouraged him from using the mechanism HR had directed him to use to avoid policy violations; (c) allowed its automated attendance system to terminate Mr. Kanyongo while his completed accommodation request sat unprocessed in BNY's own designated email inbox; and (d) failed at any point to notify Mr. Kanyongo that his September 24, 2025 submission had not been processed.

48. BNY's failure to accommodate Mr. Kanyongo's disability constitutes a violation of the ADA, 42 U.S.C. § 12112(b)(5)(A).

49. As a direct and proximate result of BNY's failure to accommodate, Mr. Kanyongo suffered lost wages and benefits, future wage loss, emotional distress, and other compensatory damages.

## COUNT II
### Disability Discrimination in Violation of the ADA
*42 U.S.C. § 12112(a)*

50. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

51. Mr. Kanyongo is a qualified individual with a disability within the meaning of the ADA.

52. BNY subjected Mr. Kanyongo to an adverse employment action - termination - on account of his disability.

53.  BNY terminated Mr. Kanyongo while his reasonable accommodation request was pending and while completed accommodation paperwork sat unprocessed in BNY's own designated inbox. The stated reason for termination - violation of the Working Together attendance policy - is pretextual, as the violations at issue were directly caused by Mr. Kanyongo's disability and BNY's own failure to process his accommodation.

54.  BNY's internal records further undermine the legitimacy of BNY's stated reason. BNY's own People Solutions portal documents that Mr. Kanyongo's manager actively discouraged him from using in-office exceptions - the very mechanism BNY now claims he should have used - while BNY's position statement to the EEOC falsely asserted that the manager "encouraged him" to do so.

55.  BNY's termination of Mr. Kanyongo constitutes unlawful discrimination on the basis of disability in violation of the ADA, 42 U.S.C. § 12112(a).

56.  As a direct and proximate result of BNY's discriminatory conduct, Mr. Kanyongo suffered lost wages and benefits, future wage loss, emotional distress, humiliation, and other compensatory damages.

## COUNT III
### Retaliation in Violation of the ADA
*42 U.S.C. § 12203(a)*

57.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

58.  Mr. Kanyongo engaged in protected activity under the ADA by requesting a reasonable accommodation beginning August 7, 2025, and by repeatedly following up on that request over the course of more than two months.

59.   BNY subjected Mr. Kanyongo to a materially adverse employment action - termination - on October 17, 2025.

60.   There is a causal connection between Mr. Kanyongo's protected activity and his termination. BNY terminated Mr. Kanyongo while his accommodation request remained pending and while his completed documentation sat unprocessed in BNY's own inbox. BNY's automated termination system was triggered by the very absences that Mr. Kanyongo's pending accommodation was intended to excuse.

61.   BNY's termination of Mr. Kanyongo in retaliation for his exercise of rights protected by the ADA constitutes a violation of 42 U.S.C. § 12203(a).

62.   As a direct and proximate result of BNY's retaliatory conduct, Mr. Kanyongo suffered lost wages and benefits, future wage loss, emotional distress, and other compensatory damages.

**COUNT IV**
**Disability Discrimination, Failure to Accommodate, and Retaliation**
**in Violation of the Pennsylvania Human Relations Act**
*43 P.S. §§ 955, 955.2*

63.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

64.   The PHRA prohibits disability discrimination, failure to accommodate, and retaliation by employers in the Commonwealth of Pennsylvania. 43 P.S. §§ 955(a), 955.2.

65.   BNY is an employer subject to the PHRA.

66.   The conduct described herein - including BNY's failure to accommodate Mr. Kanyongo's disability, its discriminatory termination of Mr. Kanyongo, and its retaliation against Mr. Kanyongo for engaging in protected activity - constitutes unlawful discrimination and retaliation under the PHRA.

67. As a direct and proximate result of BNY's violations of the PHRA, Mr. Kanyongo suffered lost wages and benefits, future wage loss, emotional distress, and other compensatory damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Gibbs Kanyongo Jr. respectfully requests that this Court enter judgment in his favor and against Defendant BNY, and award the following relief:

(a)   A declaration that BNY's conduct violated the ADA and the PHRA;

(b)   Back pay, including lost wages, salary, and benefits from the date of Mr. Kanyongo's termination through the date of judgment, with prejudgment interest;

(c)   Front pay and/or reinstatement, in an amount to be determined by the Court;

(d)   Compensatory damages for emotional distress, humiliation, and pain and suffering in an amount to be determined by the jury;

(e)   Punitive damages in an amount to be determined by the jury;

(f)   Attorneys' fees and costs pursuant to 42 U.S.C. § 12205 and 43 P.S. § 962(c.2);

(g)   Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Richard Haarbauer*
Richard Haarbauer, Esq.
PA. I.D. No. 333454
Andrew Lacy, Jr., Esq.
PA. I.D. # 321232
THE LACY EMPLOYMENT LAW FIRM

3675 Market Street, Suite 200
Philadelphia, PA 19104
(t) 412-301-3908
rickhaarbauer@lacylegal.com
andrew.lacy@lacylegal.com

*Counsel for Plaintiff Gibbs Kanyongo Jr.*